## Trump v. Menegat

C.P. of Lehigh County, no. 2001-C-1568V.

*Anthony S. Beltrami,* for plaintiff.
*Georgine Ann Olexa,* for defendants.

LAVELLE, *S.J.,* November 4, 2002—Plaintiff, Carol L. Trump, executrix of the estate of Grace E. Blose, de-

ceased, instituted the above captioned action against defendants, Joyce K. Menegat R.N. and Lehigh Valley Hospital Inc., trading as Lehigh Valley Hospital and Lehigh Valley Transitional Skilled Unit on June 8, 2001. Plaintiff claims damages for personal injuries allegedly sustained by the decedent prior to her death as the result of an alleged fall incident within the Transitional Skilled Unit of the Lehigh Valley Hospital on June 15, 1999. Plaintiff contends that decedent's fall on that date caused her to sustain a fractured hip.

Before us is a second motion of plaintiff directed to Lehigh Valley Hospital only to compel discovery and to extend the discovery deadline. Hospital has filed a timely response to plaintiff's motion to compel which squarely raises the issue whether hospital should be obliged to produce a quality assurance review form which defendant contends is privileged and protected from discovery by the Pennsylvania Peer Review Protection Act, 63 P.S. §425.1 et seq. Because we believe that this is a fact-driven issue, we directed that a hearing should be held regarding the circumstances of the preparation of the quality assurance review form, the purpose for which it was prepared and the use to which it was put. The hearing was held on September 5, 2001, from which we make the following:

## FINDINGS OF FACT

(1) An event form and a quality assurance review form are prepared at Lehigh Valley Hospital in the ordinary course of business every time there is an unusual event or incident involving a patient (N.T. 11); they are not made a part of the patient's record. (N.T. 19.)

(2) The quality assurance review form has marked on it "Risk management"; it is a follow-up form completed by the attending nurse and the supervisor of the Transitional Skilled Unit, containing a narrative description of the event, where it occurred and its effect on the patient (here a fall by the plaintiff which allegedly caused a fracture and is the focus of this malpractice case). (N.T. 6.)

(3) The director of nursing oversees the completion of the QARF and uses the form to analyze and make recommendations regarding the event to improve patient care (N.T. 7); the form looks at the processes, the action, the conclusion and follow-up on whether or not anything needs to be done to change practices, whether or not what was done was appropriate or not and whether any change is needed to improve the quality of patient care. (N.T. 26-27-44.)

(4) Policies of Lehigh Valley Hospital relative to incidents/accident reports and QARFs indicates that a QARF is to be completed and forwarded to risk management (Event report policy, procedure G) and after it receives the form, "a thorough investigation/root cause analysis will be initiated by risk management." (Event report policy, procedure H.)

(5) After its completion and signing, the director of nursing would send the original QARF to risk management on the Transitional Skilled Unit (N.T. 9); risk management would then send a copy of QARF to the vice president of the quality assurance committee.

(6) Risk management is a joint department made up of both risk management and legal services which share one office share information and work together. (N.T. 22-23.)

(7) Risk management has a dual role: it handles all malpractice claims involving Lehigh Valley Hospital from initiation to disposition (including interrogatory requests and requests for production of documents) and reviews events and incidents "with a goal in mind of prevention and quality of patient care." (N.T. 21.)

(8) At Lehigh Valley Hospital, the quality assurance committee, also known as a performance improvement committee, is comprised of physicians, administration members and a lawyer from legal services; the purpose of the committee is to review events that have a potential for causing or actually have caused harm to patients.

(9) The original QARF is reviewed in the normal course of business by risk management and a copy is sent to the Quality Assurance Committee for its review; no other persons or departments at the hospital have access to said form (N.T. 28-29) and it is maintained in the repository of risk management. (N.T. 16.)

## DISCUSSION

Hospital argues that the QARF is a record insulated from discovery by the Peer Review Protection Act and points to the following provisions appearing at 63 P.S. §425.4

"Section 425.4 Confidentiality of review organization's records

"The proceedings and records of a review committee shall be held in confidence and shall not be subject to discovery or introduction into evidence in any civil action against a professional health care provider arising out of the matters which are the subject of evaluation

and review by such committee and no person who was in attendance at a meeting of such committee shall be permitted or required to testify in any such civil action as to any evidence or other matters produced or presented during the proceedings of such committee or as to any findings, recommendations, evaluations, opinions or other actions of such committee or any members thereof."

There can be no doubt that the quality assurance committee of defendant is a "review committee" contemplated by the Act. Section 425.2 tells us that the term "review organization" includes any committee engaging in peer review, which is defined to include practice analysis, utilization review, medical audit, claims review and the like. The hospital's committee reviews and assesses the patient incident, the appropriateness of the action taken and whether any changes should be made. The hospital contends since the QARF went to and was used by the quality assurance committee it is entitled to the confidentiality protection of the Act.

But that argument ignores the following exception built into the Act:

"Provided, however, that information, documents or records otherwise available from original sources are not to be construed as immune from discovery or use in any such civil action merely because they were presented during proceedings of such committee, nor should any person who testifies before such committee or who is a member of such committee be prevented from testifying as to matters within his knowledge, but the said witness cannot be asked about his testimony before such a committee or opinions formed by him as a result of said committee hearings."

Our distinguished colleague, the Honorable James Knoll Gardner, interpreted the phrase "documents or records otherwise available from original sources" to mean "documents prepared in the ordinary course of treatment of a patient" in *Hanzsek v. McDonough,* 44 D.&C. 3d 639, 643 (Lehigh Cty. 1987). He went on to opine:

"Accordingly, we interpret the Act to mean that where a document is prepared solely for purposes of peer review, that document is not discoverable. Where a document is prepared solely in connection with recording events of the treatment of a patient, that document is discoverable." *Id.* at 644.

Here the QARF had a two-fold use and purpose. The original of the document is delivered to the risk management department, which, together with the legal department, used it to investigate, evaluate and defend the malpractice claim of the plaintiff. Risk management then sent a copy to the quality assurance committee for review and assessment for the purpose of future protection of patients.

If the purpose of the QARF was, as hospital argues, solely for purposes of quality analysis and an action plan, why was the original of the form sent to risk management, which, under hospital policy, was required to initiate an investigation/root cause analysis of the incident reported in the document? Why not send the form exclusively to the quality assurance committee?

It is clear to us that the QARF was prepared by nursing staff in the ordinary course of business after a patient accident. It was used as an investigative tool.

The information contained in the QARF was based on information also available to plaintiff and not derived

from the quality assurance committee. The fact that it was marked "Risk management," and its accessibility limited only to risk management and in-house legal counsel reinforce the inference that its principle purpose was to assist in the defense of the claim. We are persuaded that its use by the risk management/legal department was primary and its use by the peer review committee was secondary.

Where a QARF is prepared in the ordinary course of business by nursing staff and is used and controlled by the risk management department, it is, in our view, a record available from original sources within the meaning of the exception. Its availability for use by a peer review department does not imbue it with the confidentiality of the Peer Review Protection Act (PRPA) and make it undiscoverable. Therefore, we find that the QARF comes under the exception rather than the main confidentiality provisions of the Act.

Accordingly, we find that the subject quality assurance review form is not a document protected by the PRPA and we will therefore compel its discovery.

## ORDER

And now, November 4, 2002, upon consideration of plaintiff's motion to compel discovery and extend discovery deadlines, and the briefs of the parties, and after hearing thereon, it is hereby ordered and decreed that said motion be, and the same hereby is, granted, and defendant Lehigh Valley Hospital Inc. shall produce at the office of plaintiff's counsel, within 10 days from the date of this order, a true and correct copy of the quality assurance review form created on or about June 15, 2000.

It is further ordered and decreed that the deadlines established by the status conference order dated January 10, 2002, are hereby modified and extended as follows:

Completion of discovery, December 15, 2002

Plaintiff's expert's report, January 31, 2003

Defendant's expert's report, March 15, 2003

Plaintiff's settlement demand, April 15, 2003

Motions for summary judgment, April 15, 2003

Defendants' response to plaintiff's settlement demand, May 15, 2003

Tentative trial month, June 2003